**UNITED STATES of America, Appellant/Cross–Appellee,**

v.

**Quentin YANKTON, Appellee/Cross–Appellant.**

**Nos. 92–1404, 92–1482.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1992.

Decided March 1, 1993.

Stephen D. Easton, U.S. Atty., Fargo, ND, argued, for appellant.

Donald R. Becker, Fargo, ND, argued, for appellee.

Before McMILLIAN, MAGILL, and HANSEN, Circuit Judges.

HANSEN, Circuit Judge.

Quentin Yankton was found guilty by jury verdict of aggravated sexual abuse by use of force, pursuant to 18 U.S.C. §§ 2241(a) and 1153. The district court denied Yankton's motion for new trial, which raised a *Batson*[1] claim. At sentencing, the court declined to make an upward adjustment for obstruction of justice, a specific offense characteristic increase for bodily injury, an upward departure based on the facts of this case, and a downward adjustment for acceptance of responsibility.

---

1. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

Yankton was sentenced to 144 months' imprisonment to be followed by five years of supervised release, restitution in the amount of $8,089.77, and a fine of $5,000. Both parties appeal. We affirm in part and reverse and remand in part.

## I. BACKGROUND

On November 10, 1990, the victim, T.L., who was fifteen years old, was drinking beer with other teenage girls at the home of Pansy Johnson on the Devils Lake Sioux Indian Reservation. While driving his pickup, Quentin Yankton, who was thirty-nine years old, came across the teenage girls who then were also driving around. Yankton told them to follow him and his companion to Wood Lake. At Wood Lake, the two men and the teenage girls drank beer. The group later returned to the Johnson home to continue drinking and to smoke marijuana. Although Yankton is T.L.'s second cousin, he maintains that he did not know this fact until later that night.

Yankton agreed to drive T.L. and her friend to their respective homes. The friend was dropped off first. When they stopped, T.L. got out of the vehicle, talked to her friend, and got back into the vehicle. Instead of driving T.L. home, Yankton drove past T.L.'s home and on to Ziebach Pass where he proceeded to rape her. Yankton denies that the intercourse was actually a rape.[2] When Yankton finished, T.L. put her underwear and pants back on and told Yankton that her shoe fell out of the pickup and that she was going to get it. T.L. then attempted to run away, but Yankton caught her, dragged her back to the pickup, and raped her again. Yankton denies having intercourse with her a second time. Yankton threatened to beat T.L. if she told anyone and also told her that her father would not do anything because they were related. Yankton denies making such threats.

Yankton finally dropped T.L. off at the Johnson home. T.L. went into the John-son's bathroom and cried. When she came out of the bathroom, she told Wendell Johnson about Yankton twice raping her and about his threats. T.L. told him not to let Yankton in the house. T.L. got two knives for her protection. When Yankton knocked on the door, T.L. jumped out the window and ran, taking the knives with her. She ran home, woke her father and stepmother, and told them about the rapes. They tried to calm her, took the knives from her, and took her to the police station. From the station, she was taken to a hospital for a medical examination.

Two days later, when Yankton was being held on tribal charges for a liquor violation and for contributing to the delinquency of a minor, the tribal investigator informed Yankton of his *Miranda* rights and asked him about T.L.'s allegations of rape. Yankton denied raping T.L.

T.L. became pregnant with twins as a result of the rape. One twin died in utero. Because of complications with the pregnancy, T.L. was hospitalized and gave birth to the remaining child by cesarean. The baby girl was born with a fatal disease, osteogenesis imperfectis, that caused her bones to be extremely brittle. The baby died three weeks after birth. T.L. had not attended school since the time of the rape and did not return until after her daughter had died.

Medical tests established that on the night of November 10, 1990, Yankton had intercourse with T.L. The tests further proved to a 99.243% degree of certainty that Yankton was the father of T.L.'s baby girl. Although Yankton initially denied having any sexual relations with T.L., he contended at trial that he and T.L. did have intercourse that night but that it was consensual. The jury convicted Yankton.

## II. ISSUES RAISED ON APPEAL

The government raises two issues in its appeal. First, the government contends

---

**2.** Yankton alleges that he and T.L. drove around unsuccessfully looking for more marijuana. Yankton also asserts that T.L. agreed to have sex with him if he obtained more marijuana. Yankton admitted at trial that he did have inter-course with T.L. at Ziebach Pass but claimed that it was consensual and was not the result of any threat or use of force. In finding Yankton guilty, however, the jury obviously rejected Yankton's defense of consent.

that the district court's decision to not make a upward adjustment for obstruction of justice pursuant to United States Sentencing Guideline § 3C1.1 was clearly erroneous. The second argument raised by the government is that the district court erred by not making a specific offense characteristic increase for bodily injury suffered by the victim pursuant to U.S.S.G. § 2A3.1(b)(4) or by not departing upward based on the facts of the case. We affirm the district court on the first issue but reverse and remand on the second issue.

### A. OBSTRUCTION OF JUSTICE ADJUSTMENT

The government requested that the district court make a two level increase in Yankton's base offense level pursuant to U.S.S.G. § 3C1.1 for obstruction of justice. The government based its request upon Yankton's initial denial to the tribal investigator that he had sexual intercourse with the victim, his alleged perjurious testimony under oath, and his repeating these statements to the probation officer.[3] We review the district court's finding for clear error only. *United States v. Amos*, 952 F.2d 992, 994 (8th Cir.1991) (citing *United States v. Dyer*, 910 F.2d 530, 533 (8th Cir.), *cert. denied*, 498 U.S. 907, 111 S.Ct. 276, 112 L.Ed.2d 232 (1990)), *cert. denied*, —— U.S. ——, 112 S.Ct. 1774, 118 L.Ed.2d 432 (1992).

 "A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury) ... is not a basis for application of this provision." U.S.S.G. § 3C1.1, comment. (n.1). Yankton's statement to the tribal investigator was, "I did not rape [T.L.], she's my niece." *See* trial transcript, at 302. Although Yankton admitted at trial that the statement was false to the extent that it meant he did not have sexual intercourse with the victim, we view Yankton's statement to be a general denial of

guilt that was not made under oath. Therefore, the district court's refusal to make an obstruction of justice adjustment based upon the statement made to the tribal investigator was not clear error. Likewise, any general denial made by Yankton to the probation officer was also not a proper basis for an obstruction of justice adjustment.

 The government argues that Yankton's testimony at trial was perjury sufficient to constitute the primary basis for an obstruction of justice adjustment. The obstruction of justice adjustment should not be imposed "based on the defendant's testimony if a reasonable trier of fact could find the testimony true. *See* U.S.S.G. § 3C1.1 comment. (n. 1) (defendant's testimony and statements should be evaluated in light most favorable to the defendant)." *United States v. Willis*, 940 F.2d 1136, 1140 (8th Cir.1991), *petition for cert. filed*, (Dec. 9, 1991). In addition, the adjustment "cannot be given simply because a defendant testifies in his own behalf and the jury disbelieves him." *Id.* "The district court itself must find that the defendant committed perjury before making the upward adjustment." *Id.* (citing *Dyer*, 910 F.2d at 533).

In asking this court to reverse the district court's refusal to make an obstruction of justice adjustment, the government relies on *United States v. Lange*, 918 F.2d 707 (8th Cir.1990), in which this court reversed the district court's refusal to make an obstruction adjustment. In *Lange*, the defendant had admitted making false statements in open court and to the probation officer for the purpose of receiving a light sentence. *Id.* at 708–09. In this case, however, no such admission of perjury was made. Rather, we have a specific finding from the trial judge, who heard all of the testimony and saw all of the evidence, that the defendant's testimony was not perjury

---

**3.** The government also makes an obstruction of justice argument based upon Yankton's "defamatory" written statement to the Probation Office prior to sentencing. In that statement, he asserted T.L. told him that night that her father sexually abused her while she was growing up and that she stated she was "a whore just like

her mother." Beyond asserting the statement is defamatory, however, the government fails to explain how it obstructed the administration of justice during the sentencing. We are not persuaded that the statement can serve as a basis of a U.S.S.G. § 3C1.1 adjustment in this case.

and that an obstruction of justice adjustment was not warranted.

I have no problem in finding that there was no perjury in the sense that there was a making of a case for perjury. In my mind there was a disagreement of facts that was presented to the jury for the jury to make a decision on and they did and they chose to believe the facts, if there is a dispute, they chose to believe the facts recited by the victim.

Sentencing transcript at 30. We do not find that the district court's finding of no perjury was clearly erroneous, and consequently its decision not to impose an upward adjustment for obstruction of justice must be affirmed.

### B. SPECIFIC OFFENSE CHARACTERISTIC INCREASE OR DEPARTURE FOR BODILY INJURY

The government also argues that T.L.'s pregnancy, with its tragic consequences, constitutes a "bodily injury" for which a specific offense characteristic increase should be made pursuant to U.S.S.G. § 2A3.1(b)(4). In the alternative, the government argues that the district court should have departed upward to account for these facts. The district court rejected both of the government's arguments.

■ Whether pregnancy resulting from forcible rape can be considered a bodily injury under the Guidelines appears to be a question of first impression. As the issue involves an interpretation of the scope of the guidelines, it is a question of law that this court reviews de novo. *United States v. Werlinger*, 894 F.2d 1015, 1016 (8th Cir. 1990). At sentencing, the government requested that a two or three level specific offense characteristic increase be made pursuant to U.S.S.G. § 2A3.1(b)(4). Guideline § 2A3.1 provides that the base offense level of 27 for the crime of criminal sexual abuse should be increased if the victim sustained bodily injury.

(A) [I]f the victim sustained permanent or life-threatening bodily injury, increase by 4 levels; (B) if the victim sustained serious bodily injury, increase by 2 levels; or (C) if the degree of injury is

between that specified in subdivisions (A) and (B), increase by 3 levels.

U.S.S.G. § 2A3.1(b)(4). Whether such an increase is appropriate in this case depends upon whether the pregnancy and its tragic consequences constitute a "serious bodily injury."

The guidelines define "serious bodily injury" as follows:

"Serious bodily injury" means injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. As used in the guidelines, the definition of this term is somewhat different than that used in various statutes.

U.S.S.G. § 1B1.1, comment. (n. 1(j)) (1990). The district court stated that it was "of the view that serious bodily injury did not fit in this situation." Sentencing transcript at 36. As defined in the guidelines, serious bodily injury easily includes any immediate serious physical trauma resulting from a rape. In contrast, interpreting the language of the guideline definition to include the life altering consequences of a rape induced pregnancy stretches that language too far. Given the guideline language used and the absence of any record, Sentencing Commission history, or commentary to the contrary, we find that the Sentencing Commission did not intend the situation presented by the facts in this case to be addressed by the specific offense characteristic adjustment in § 2A3.1(b)(4). We therefore affirm the district court's decision not to apply the adjustment for serious bodily injury.

■ The government argues in the alternative that the court should have departed upward based on the facts of this case. The court may depart upward if "there exists an aggravating ... circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0. On appeal, this court is not empowered to review the district

court's exercise of its discretion to refrain from departing upward from the range established by applicable guidelines. *United States v. Comeaux*, 955 F.2d 586, 592 (8th Cir.) (citations omitted), *cert. denied*, —— U.S. ——, 113 S.Ct. 135, 121 L.Ed.2d 89 (1992). The legal question of whether the district court had the authority to depart upward in the exercise of its discretion, however, is reviewed by this court de novo. *United States v. Kelley*, 956 F.2d 748, 751 (8th Cir.1992) (en banc) (citations omitted).

In this case, the district court judge declined to depart upward, reasoning that he "believe[d] that the Sentencing Commission must have considered this fact that a pregnancy may result from a rape. It is a pretty common, commonly understood but unfortunate result." *See* sentencing transcript at 38. We interpret the district judge's remarks as a conclusion that he could not depart upward because the Sentencing Commission must have considered rape induced pregnancy in formulating the Guideline but did not include any sanctions for it. The district court offers no factual support for its conclusion. After reviewing the district court's conclusion de novo, we reverse and remand for resentencing on this issue. We are not aware of any facts that indicate a pregnancy "commonly" results from a single instance of rape. Nor are we aware of any guideline provision or records that indicate the Commission considered rape induced pregnancy as a basis for an adjustment or departure. Rather, we are loath to conclude that when formulating U.S.S.G. § 2A3.1(b)(4), the Commission considered both the trauma of an unwanted rape induced pregnancy and of an immediate obvious physical injury, but chose to increase punishment only for the physical injury. Such a choice would render the court able to increase the sentence for a broken bone sustained in resisting a sexual assault, yet powerless to account for the pain and trauma of a pregnancy directly resulting from the rapist's criminal conduct. We would not presume that the Commission would be so callous as to consider but then ignore the pain and trauma of a pregnancy resulting from a rape. The potential depth of such a trauma is tragi-

cally illustrated in this case. The fifteen-year-old victim became pregnant with twins and lost one of the twins in utero. The victim was hospitalized due to complications with the pregnancy and gave birth to the remaining child by cesarean. Only three weeks after birth, the baby girl died from a fatal disease. We conclude that the aggravating circumstances present in this case are "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." Although the pain and suffering endured by T.L. is not encompassed by the specific offense characteristic adjustment's definition of "serious bodily injury," in our view it may serve as the factual predicate for an upward departure. We hold that the district court erred in concluding that it could not depart on this basis. We reverse the district court's conclusion on this issue and remand so that the district court may consider the government's departure motion on its merits. 18 U.S.C. § 3742(f)(1). We in no way intimate whether or not departure should occur, leaving that decision to the initial judgment of the experienced district judge. We only hold that departure is not precluded.

## III. ISSUES RAISED ON CROSS-APPEAL

Yankton raises two issues on cross-appeal. We affirm the district court with respect to both issues.

### A. ACCEPTANCE OF RESPONSIBILITY

■ Yankton argues on cross-appeal that the district court was clearly erroneous when it refused to make a downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. This claim is meritless. Although the defendant professes remorse for the consequences of his actions, he still maintains on appeal that he did not forcibly rape the victim. The district court was not clearly erroneous in denying the adjustment for acceptance of responsibility.

## B. *BATSON* CLAIM

■ Yankton's other issue on cross-appeal is that the government violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by using a peremptory challenge to strike the only known Native American from the jury panel. The government explained its reasons for using the peremptory strike in this way.

> [I]n all of the trials that I have ever tried I have never let someone sit on a jury where I have had that person's close relative in the process of being prosecuted for a serious crime and I just do not think that the government in good conscience to its client can simply overlook an obvious factor which I have to consider. I do so certainly with some regret because I recognize that that immediately creates and [sic] appellate issue for the defense, but he was not taken off because he was an Indian; that was the furthest thing from my mind. We would have loved to have left him. But unfortunately, I think balancing all else, when you stack him up against the rest of the jurors who are neutral in that thing, any prosecutor would have to make the decision that he's a risk.

*See* voir dire transcript, at 110–11. The district court noted, "In this case, the government stated the potential juror was stricken because his brother was being prosecuted for a state charge at the time. That is sufficient." *United States v. Yankton*, Crim. No. C2–91–17, slip op. at 8 (D.N.D. Dec. 23, 1991). "The trial court's rulings on *Batson* claims are entitled to considerable deference and may be overruled only upon showing of clear error." *United States v. Day*, 949 F.2d 973, 979 (8th Cir.1991) (citations omitted). We find that the district court was not clearly erroneous in denying Yankton's motion for new trial with respect to this issue.

## IV. CONCLUSION

We affirm the district court's decision not to make an upward adjustment for obstruction of justice or to make a specific offense characteristic increase for bodily injury. We reverse and remand the district court's decision, however, that an upward departure could not be made based on the facts of this case. We affirm the district court on both issues raised in the cross-appeal by Yankton.